ANDREW E. HOLMAN and MARY I. HOLMAN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Holman v. Commissioner
Docket No. 3586-74.
United States Tax Court
T.C. Memo 1975-273; 1975 Tax Ct. Memo LEXIS 100; 34 T.C.M. (CCH) 1176; T.C.M. (RIA) 750273; 52 Oil & Gas Rep. 455; August 28, 1975, Filed. Louis J. Moriarty, for the petitioners. Gerald W. Leland, for the respondent. FEATHERSTON
MEMORANDUM FINDINGS OF FACT AND OPINION FEATHERSTON, Judge: Respondent determined a deficiency of $ 5,515.45 in petitioners' Federal income tax for 1971. The sole issue in controversy is whether the gain realized from the sale of certain contingent mineral interests should be characterized as ordinary *101 income or capital gain. The answer depends upon whether petitioners held the property as an investment or primarily for sale to customers in the ordinary course of business within the meaning of section 1221. FINDINGS OF FACT Petitioners Andrew E. Holman and Mary I. Holman, husband and wife, were legal residents of Minneapolis, Minnesota, at the time their petition was filed. Andrew E. Holman (hereinafter Holman) has been engaged in various phases of the oil business for many years. Through these activities he learned of a controversy with respect to homesteaders' mineral rights in New Mexico. Individuals who obtained land from the United States Government under the homestead laws were not treated uniformly with respect to the mineral interests in their lands. In some instances, prior to receiving title to the land, the homesteaders were required to sign papers which reserved the mineral rights to the Federal government. Some of these individuals successfully contested the mineral reservations. Other homesteaders were never required to execute such mineral reservations. These inequities, coupled with allegations that some reservations were signed under duress, led to the enactment *102 of a private relief bill on behalf of one homesteader, John W. Marr, which required the Federal government to reconvey the reserved mineral interests to the Marr family. Other homesteaders sought similar relief. Holman made the acquaintance of James Lofland (Lofland) who had obtained conveyances of contingent mineral interests from some of the aggrieved homesteaders in New Mexico. The conveyances to Lofland were conditioned upon the enactment of general relief legislation restoring the mineral rights to the homesteaders. In 1957 or 1958, Holman and Lofland organized Minne-Tex, Inc., to assist in handling the financial aspects of obtaining the desired relief legislation. As president of Minne-Tex, Inc. Holman supervised the lobbying efforts in Washington, D.C., and provided some of the funds needed for the lobbying activities with respect to the general relief bill. Lofland sold some of his mineral rights and deposited the funds with Minne-Tex, Inc. These funds were utilized to defray the expenses arising from the lobbying efforts. During this period, Holman employed Bailey Walsh (Walsh) to assist in lobbying on behalf of a general relief bill for New Mexico homesteaders. Walsh *103 was acquainted with Senator Dennis Chavez of New Mexico who had introduced the bill and advocated its enactment. William J. Knighton (Knighton) had also become interested in the New Mexico homesteaders' mineral rights issue. He had obtained conveyances, contingent upon the enactment of relief legislation, covering one-half of the mineral interest in 42,000 acres of land in New Mexico. On April 19, 1960, Holman and Knighton entered into an agreement which stated that Knighton agreed to sell to Holman 50 percent of his rights in the mineral interest in the 42,000 acres. As consideration for the sale, Holman agreed to pay Knighton $ 1,500 "for each one (1%) percent of said mineral interest which * * * [Holman] may sell to any other person, firm or corporation by September 1, 1962." If Holman failed to sell all of the interest by that date, the unsold portion would revert to Knighton. Holman was also given the option of buying suc interest at the stated price on or before September 1, 1962. The agreement disavowed the creation of an agency relationship and purported to give Knighton a mortgage for the unpaid balance of the amount payable at the rate of $ 1,500 for each 1 percent *104 of the mineral interest. Passage of the relief bill was delayed when Senator Chavez became ill, and it had not been passed when he died in November 1962. In April or May 1963, Walsh, the lobbyist hired by Holman, died. Prior to Walsh's death, Holman had expended $ 20,000 to $ 25,000 in lobbying for the general relief bill. Minne-Tex, Inc., the corporation formed by Holman and Lofland, ceased doing business in 1964. On September 1, 1966, Holman and Knighton executed an extension of their initial agreement. The new contract called for an extension of their agreement to September 1, 1968, and provided for the payment by Holman of $ 750 for each 1 percent of the original mineral interest described in their first agreement. In the event of Holman's death, his interests and rights under the agreement were to revert to Knighton. The new agreement also stated that an agency relationship was not created and that Knighton would have a mortgage on the mineral interests to secure any unpaid balance. On May 6, 1968, the estate of Knighton, who had died in the meantime, and Holman executed a further extension of the agreement through June 1971. From 1962 through 1971, Holman sold portions *105 of the interest covered by the agreement with Knighton, and in 1972, the Securities and Exchange Commission secured a permanent injunction prohibiting Holman from making further sales of the mineral rights. On his Federal income tax returns, Holman reported gross income and expenses from these sales in the following amounts: 1962
1965
1966
1967
Gross
Income
$ 103,250.00
$ 37,500.00
$ 65,250.00
$ 21,750.00
Expenses
$ 55,128.13
$ 19,003.78
$ 27,425.26
$ 12,580.90
1968
1969
1970
1971
Gross
Income
$ 7,000.00
$ 89,797.00
$ 29,400.00
$ 40,500.00
Expenses
$ 5,757.30
$ 19,097.67
$ 15,281.49
$ 16,318.66
Holman used his yearly sales expenses as the basis of the mineral rights sold, thus reducing the net income reported, and treated the income as capital gains. On petitioners' 1962, 1967, 1968, and 1971 Federal income tax returns, the various sales expenses were categorized as follows: EXPENSES: SALE OF MINERAL RIGHTS 1962
1967
1968
1971
Other operating expenses
$ 3,108.76
Travel
19,150.68
$ 2,072.15
$ 2,933.60
$ 5,058.02
Legal and accounting
3,526.82
69.99
235.00
1,550.00
Misc. business expenses
122.31
31.83
Equipment repairs
1,323.85
Commissions paid
15,326.01
4,405.06
1,350.00
Business promotion
9,288.21
1,349.02
6,186.58
Telephone and telegraph
2,168.44
2,136.00
324.19
1,153.50
Secretarial fee
520.40
Interest expense
592.65
Depreciation
1,425.00
1,250.00
Supplies
633.85
245.23
Insurance
458.00
Auto expense
300.10
832.06
Bank charges
69.18
74.50
Office expense
300.00
214.00
Total expenses
$ 55,128.13
$ 12,580.90
$ 5,757.30
$ 16,318.66
*106 The category "business promotion" was comprised of the expenses Holman incurred while entertaining prospective purchasers of the mineral interests. The category "travel" represented expenses Holman incurred in interviewing prospective purchasers of the interests. Petitioners' tax returns for these years were prepared by their accountant who used check registers provided by petitioners. The register showed, interalia, the amount of the check, the payee, and the purpose for which each expenditure was made, classified according to the categories described above. Petitioners classified the expenses, and the accountant transferred the totals in each category to the tax return. ULTIMATE FINDING OF FACT Holman held the contingent mineral interest primarily for sale to customers in the ordinary course of his business. OPINION Petitioners reported the gains realized from the sale of contingent mineral interests as capital gains. Such treatment is justified only where there is a sale or exchange of a capital asset. Secs. 1201, 1222. The phrase "capital asset" is broadly defined in section 1221(1) as follows: SEC. 1221. CAPITAL ASSET DEFINED. For purposes of this subtitle, *107 the term "capital asset" means property held by the taxpayer (whether or not connected with his trade or business), but does not include-- (1) * * * property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business; The purpose of this exclusion is to deny favorable capital gains treatment for the "profits and losses arising from the everyday operation of a business." ; . Respondent determined that the gains in controversy are taxable as ordinary income because the mineral interests were not "capital assets." Respondent maintains that the mineral interest acquired by Holman from Knighton was held "primarily for sale to customers in the ordinary course" of Holman's business. Sec. 1221(1). We agree, and hold for respondent. In determining whether gains are properly classified as derived from the everyday operation of a business, there is no fixed formula applicable to every situation. No one factor controls--each case must be evaluated on the interplay of its particular facts. ; *108 , affg. ; ; ; ; . The issue is purely factual, and the burden of proving that the mineral interests were not held primarily for sale in the ordinary course of business rests with petitioners. , affg. ; , affg. . . Several factors serve as helpful guidelines: The purpose for which the property was acquired; the activities of the taxpayer in promoting sales; the continuity and frequency of sales as distinguished from isolated transactions; and "any other fact which tends to indicate whether the sale or transaction was in furtherance of an occupation of the *109 taxpayer." ; ; . In the instant case, the facts demonstrate that Holman held the mineral interests primarily for sale in the ordinary course of his business. The so-called mortgage agreement executed by Knighton and Holman provides: (1) That in addition to the consideration of One Dollar ($ 1.00) and other valuable consideration, the Second Party [Holman] shall pay to the First Party [Knighton] a sum equal to Fifteen Hundred ($ 1,500.00) Dollars for each one (1%) percent of said mineral interest which the Second Party [Holman] may sell to any other person, firm or corporation by September 1, 1962. (2) That in the event should the Second Party [Holman] fail to sell all of the interest by September 1, 1962 that [sic] the unsold portion shall revert back to First Party [Knighton] and the Second Party [Holman] agrees he will execute a document necessary for the re-conveyance thereof. (3) That the Second Party [Holman] shall have the right on *110 or before the 1st day of September, 1962 to pay the full consideration based upon the price as reflected in paragraph (1). It is clear from these provisions that sale of portions of the mineral interest was contemplated at the time Holman obtained it from Knighton. Indeed, although Holman had the right under the agreement to acquire outright ownership in his own name by paying the full purchase price for any percentage of the mineral interest, he never did so. Rather, he paid only the sums owed upon sale of the percentage interests under the initial agreement and its extensions. Clearly, the purpose of Holman's agreement with Knighton was to enable Holman to sell portions of the mineral interest at a profit. Subsequent to the original agreement in 1960, Holman reported substantial gross income each year from the sale of mineral interests. His transactions were thus frequent and continuous. Holman also incurred substantial expenses in the sale of mineral interests. Among the expenditures were large amounts for promotion, travel, and commissions. Promotion expenses were those incurred in becoming acquainted with and entertaining prospective purchasers, and travel expenses were *111 incurred in making trips to the various cities in which the prospective purchasers lived. Large amounts of the expenses were categorized as commissions, indicating that Holman employed others to assist him in making sales. Holman testified that he did not know what expenses were included in that category but insisted that he paid no commissions. Holman's accountant testified that these expenditures may have been amounts paid to Knighton under the "mortgage" agreement. However, the amounts listed on the returns as commissions simply do not correspond with Holman's testimony regarding the percentages of the mineral interest sold in those years, [2]/ and in the absence of other credible evidence we conclude the expenses are what they were reported to be on petitioners' returns--commissions. , affg. a Memorandum Opinion of this Court; , affg. a Memorandum Opinion of this Court. Regardless of whether Holman paid commissions to agents working for him in making sales, it is apparent that he incurred large amounts of expenses *112 in a sustained sales effort. Indeed, with the exception of minimal salary income from Minne-Tex, Inc., and certain other salary income during 1967 and 1968, the gains derived from the sale of the mineral rights were Holman's only significant income during the entire period 1960 through 1971. Petitioners argue that the mineral interest was purchased solely as an investment and not for sale in the ordinary course of business and that Holman made the sales only to finance his lobbying efforts. See . Petitioners rely primarily upon Holman's testimony to support their claim. We are not satisfied that Holman made *113 the requisite showing. His testimony was riddled with inconsistencies and he could not recall crucial details. For example, Holman claimed he could not recall what expenses were in each category listed on his returns and that he did not know how his accountant had classified these expenses. The accountant testified that he merely added up the figures for expenses which were placed in the several categories by Holman, and utilized the total for each category in preparing petitioners' returns. Holman's memory was clear, however, concerning conversations with his lobbyist and Senator Chavez which took place nearly 15 years ago. Holman testified that he sold the interests only when he needed money for his lobbying efforts in Washington, D.C., and not as a separate business. See ; compare ; ; . No corroborating evidence was introduced of lobbying after 1963, the year during which Bailey Walsh, the lobbyist, passed away. Holman stated that the lobbying expenses approximated $ 25,000 up to 1962, far less *114 than the $ 103,250 he received as proceeds from the sale of mineral interests in that year or the $ 48,121.87 he reported as net income from those sales. Petitioners claim that Holman retained nearly 75 percent of his original interest as support for the argument that the mineral interest was not held primarily for sale. But we have only Holman's testimony as to the percentages of the interest sold up to 1971 and the percentages retained. The percentages to which he testified were read from a list, purportedly Holman's only record of the sales, and the list contained no names or other means of identifying the purchasers, the amount sold, or the amount of the mineral rights remaining unsold. No other evidence substantiating the amount of sales was presented. Moreover, we are not satisfied that Holman ever actually acquired any mineral interest as such from Knighton. As detailed in our Findings, Holman was to pay Knighton $ 1,500 ( $ 750 after September 1, 1966) for each 1 percent of a one-half interest in the 42,000-acre mineral interest as he made sales. Any and all rights acquired under this provision would revert to Knighton on the expiration dates stated in the agreement and *115 the extensions thereof or at Holman's death. True, Holman had the right to pay the full consideration of $ 1,500 or $ 750 for each 1-percent interest and, presumably, thereby acquire the entire interest covered by their agreement. But the undisputed fact is that Holman never did so. [3]/ Thus, Holman's retention of 75 percent of his original interest is illusory. In sum, petitioners have failed to introduce convincing evidence that the mineral interest was not held primarily for sale in the ordinary course of petitioners' business. To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
2. /↩ Holman testified that he sold the following percentages of his interest: 1962--5-1/2 percent; 1963--1-1/2 percent; 1964--1/4 percent; 1965--2 percent; 1966--3-1/2 percent; 1967--1 percent; 1968--1/2 percent; 1969--5-1/4 percent; 1970--1-5/6 percent; 1971--2-13/15 percent. Under the agreement in effect in 1962, for example, Holman owed Knighton $ 8,250 ($ 1,500 X 5-1/2%), substantially less than the $ 15,326.01 claimed as commissions. Similar dispartities result in all the years the expenses are itemized.
3. /↩ Since Holman evidently never actually acquired ownership of the mineral interests prior to their sale, it is not at all clear that he had the requisite holding period for long-term capital gain treatment. See sec. 1222(3).